UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| **Darchelle Braxton**<br>1309 Buckhead Terrace<br>Midlothian, VA 23113 | |
| Plaintiff, | Case No. ___3:26cv331___ |
| v. | |
| **Bank of America Corporation,**<br>100 North Tryon Street<br>Charlotte, NC 28255 | |
| Serve Registered Agent:<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange St<br>Wilmington DE 19802 | |
| **Bank of America, National Association,**<br>100 North Tryon Street<br>Charlotte, NC 28255 | |
| Serve Resident Agent: CT Corporation System<br>4701 Cox Rd Ste. 285<br>Glen Allen, VA, 23060 | |
| **David M. Boyd,**<br>4000 City Walkway, Apt # 425<br>Charlottesville VA 22902 | |
| and | |
| **Velox Valuations, LLC**<br>10 Innisbrooke Trl<br>Greenwood, IN, 46142 | |
| Serve Resident Agent:<br>Chad Wayne Barker<br>10 Innisbrooke Trl<br>Greenwood, IN 46142 | |
| Defendants. | |

1

## INITIAL COMPLAINT

Plaintiff, Darchelle Braxton, by and through her attorney, Lucrecia P. Johnson, Esq., and LPJ Legal, PLLC, hereby moves this Honorable Court for judgement in this civil action against Defendants, Bank of America Corporation, Bank of America National Association, David M. Boyd, and Velox Valuations, LLC, and in support thereof, Plaintiff states, as to knowledge of her own actions and otherwise upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      This is an action for race discrimination in mortgage lending and property appraisal. Plaintiff is an African American woman who sought a mortgage loan from Defendants Bank of America Corporation and Bank of America National Association for a residential investment property in Richmond, Virginia. Despite being qualified for the loan, as evidenced by another lender's subsequent approval, Plaintiff was subjected to a pattern of delay and unprofessional treatment by Bank of America Employees, and an unduly low appraisal of her property's value by Defendants, David M Boyd and Velox Valuations, LLC. Defendants' actions were motivated by unlawful discrimination on the basis of Plaintiff's race and gender.

2.      Plaintiff brings this civil action to hold defendants accountable for their discriminatory action and to seek redress for violations of the Fair Housing Act, the Equal Credit Opportunity Act, the Civil Rights Act, the Virginia Fair Housing Act, and other common law causes of action.

### PARTIES

3. Plaintiff is an adult individual and a citizen of the Commonwealth of Virginia residing in Midlothian, Virginia. She is an African American, or Black, and a Woman. Plaintiff is the owner of the residential property that is the subject of this complaint.

2

4.      Defendant, Bank of America ("BAC"), is a corporation that is incorporated in Delaware with a principal place of business located at 100 North Tryon Street, Charlotte, North Carolina 28255. BAC is authorized to do business in Virginia. BAC, through its subsidiaries, offers mortgage lending services. Plaintiff initially sought a mortgage loan from Bank of America.

5.      Defendant, Bank of America, National Association ("BANA"), is a wholly owned subsidiary of Bank of America Corporation. BANA is incorporated in Delaware and has its principal place of business at 100 North Tryon Street, Charlotte, North Carolina 28255. BANA is authorized to do business in Virginia and operates branches in Virginia. In this complaint, "Bank of America" or "BOA" refers collectively to BAC or BANA.

6.      David M. Boyd is a citizen of the Commonwealth of Virginia. David M. Boyd is a Certified General Real Estate Appraiser licensed by the Virginia Department of Professional and Occupational Regulation. David M. Boyd worked for, or was an agent of, Defendant Velox Valuations, LLC, on or about September 14, 2025.

7.      Velox Valuations, LLC is a corporation that is incorporated in Indiana but conducts business in the Commonwealth of Virginia.  Bank of America engaged Velox Valuations to perform the appraisal of Plaintiff's property, and David M. Boyd performed the appraisal on Velox's behalf. Boyd and Velos will be referred to collectively as the "Appraiser Defendants."

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under 42 U.S.C. § 3601 et seq, 15 U.S.C. § 1691 et seq, and 42 U.S.C. §§ 1981, 1982.

3

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of Virginia, Delaware, and Indiana, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Plaintiff also brings her complaint pursuant to 28 U.S.C. § 1367, as the District Court has supplemental jurisdiction over state claims arising from the same case and controversy as the federal claims.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b), in that Defendants conducted business in or are residents of this district, a substantial part of the events or omissions giving rise to the claims occurred in the district, and a substantial part of the property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS

12.     Plaintiff, Darchelle Braxton, is an African American Woman.

13.     Plaintiff owns a residential property located at 1506 Court St., Richmond, VA, 23222 ("the Property"), which she holds as an investment property.

14.     In the summer of 2025, Plaintiff decided to obtain a loan to fund improvements and renovations on the property.

15.     At the time, Plaintiff owned the home free and clear of any mortgages or other encumbrances.

16.      The property was initially held in the name of an LLC owned and operated by Plaintiff. In or around February 2025, Plaintiff visited a Bank of America branch in Virginia and inquired about obtaining a loan for her property, hoping to take advantage of favorable interest rates and the equity in her property.

17.     Plaintiff applied for a loan for $100,000.00 and expected to receive an interest rate of 6.2%.

4

18.    The location of the Bank of America Branch is a majority-white area.

19.    Plaintiff believed that her strong equity position and creditworthiness would make her an ideal loan customer.

20.    However, the process of applying for a loan at BOA proved to be emotionally straining, embarrassing, and demeaning.

### Discriminatory Interactions with Bank of America Agents

21.    From the very beginning of the application process, Plaintiff encountered resistance and unusually poor customer service.

22.    BOA employees did not appear to want her as a customer, nor did they take her loan inquiry seriously.

23.    The process of applying for a loan dragged on for several months, during which Plaintiff was passed between four different white loan officers, all of whom seemingly did not want to work with her or provide consistent help.

### The First Loan Officer

24.    Ryan was the first loan officer that Plaintiff worked with.

25.    The first loan officer she worked with instructed Plaintiff to transfer the property's title from her LLC to her own name to meet the bank's lending requirements.

26.    After Plaintiff transferred the property's ownership and submitted application documents, the first loan officer became unresponsive.

27.    Plaintiff made several attempts to contact the officer, and when she finally contacted him, he told Plaintiff that he was too swamped to handle her application.

### The Second Loan Officer

28.     Plaintiff was moved to a second loan officer, Frank, who requested that Plaintiff resubmit all application documentation, even though Plaintiff had already provided all these materials to the first loan officer.

29.     Willing to cooperate, Plaintiff provided the documents again.

30.     After confirming receipt of the documents, the second loan officer disappeared. Eventually, Plaintiff learned that the second loan officer had left Bank of America. The bank never proactively informed Plaintiff of this change or re-assigned her case to a new agent.

**Back To The First Loan Officer**

31.     At some point, Ryan offered to take back Plaintiff's file. However, the pattern of unresponsiveness continued.

32.     Plaintiff repeatedly emailed and called the first loan officer for updates but received little to no reply.

33.     Plaintiff made in-person visits to the BOA branch to discuss her loan application since her emails and phone calls were being ignored.

34.     During one such visit, the agent told her that she did not have a phone to call Plaintiff. This statement was patently false, as there are several phones in the branch, and Plaintiff was staring at the loan officer's phone during the conversation.

35.     On another visit, after the loan officer saw Plaintiff enter the building, he walked out to avoid speaking to her. The officer remained outside for the duration of Plaintiff's visit and did not re-enter the bank until Plaintiff left the building. This blatant avoidance was humiliating for Plaintiff and underscored the disrespectful manner in which she was being treated.

36.     Plaintiff spoke to a branch manager to complain about the lack of updates or communications. Plaintiff recounted the saga of her application: the multiple BOA employees who

mishandled her file, the duplicative document requests, the weeks of ignored communications, and the fact that one of their loan officers physically walked away rather than speak to her.

37.    Plaintiff expressed that she felt she was being given the run-around and even suspected she was being treated this way because of her race and gender, as she could think of no other reason for such extraordinary neglect.

### The Third Loan Officer

38.    Shortly after complaining to the manager, Plaintiff's application was assigned to a new loan officer, Tammy. Plaintiff, again, was asked to restart the application process and resubmit the same documents for a third time.

39.    Plaintiff, again, complied with the request; she inquired if she could submit certain documents in a more secure portal instead of emailing them directly to the loan officer.

40.    This request was made because Plaintiff was concerned about the fact that she had to keep emailing her sensitive and personal financial documents to different employees, and these documents kept getting lost or simply not uploaded into the appropriate systems.

41.    Plaintiff hoped that by emailing it into a secure portal, it would be in a location that a future loan officer could securely access in the future.

42.    The third loan officer informed Plaintiff that Bank of America had no secure portal and that Plaintiff needed to send her files via ordinary email.

### The Fourth Loan Officer

43.    After some time, the third loan officer either left the company or took some personal time, and Plaintiff was assigned to the fourth loan officer, Nathan.

44.    The fourth loan officer, again, requested that Plaintiff resubmit the documents she already submitted by email.

45.    Plaintiff requested the portal but received the same response that there was no secure portal.

46.    The fourth agent was dismissive and unprofessional.

47.    At some point during their conversation, the fourth loan officer commented that he already had Plaintiff's social security number and personal information and that he could steal her information if he wanted.

48.    The disrespectful and unprofessional treatment from all the loan officers left Plaintiff feeling frustrated, singled out, and discriminated against, especially because other people of different races and genders were treated in a more professional and respectful manner.

### The Home Appraisal

49.    As part of Plaintiff's loan application, Bank of America required an official appraisal of the Property's value.

50.    Bank of America hired Defendant Velox Valuations, LLC, to handle the appraisal.

51.    Velox assigned Defendant David M. Boyd to evaluate Plaintiff's property.

52.    The appraisal inspection took place on or about September 14, 2025.

53.    On September 19, 2025, Defendant Boyd (through Velox) issued an appraisal report valuing Plaintiff's Property at approximately $135,000. *See Exhibit A*.

54.    This valuation was shockingly low given the characteristics of the home and recent sales in the neighborhood.

55.    Less than one month later, on October 16, 2025, an appraisal of Plaintiff's home was conducted by Premier Appraisal Group, and that appraisal valued the Property at approximately $208,000. *See Exhibit B*.

56.    There were no significant changes to the Property's condition, the neighborhood, or the local housing market in the short period between the two appraisals.

57.    Upon further review and comparison, the appraisal report prepared by the Appraiser Defendants contained numerous material errors, omissions, and inconsistencies, which served to depress the appraised value.

58.    The appraisal included an incorrect map reference, referring to 40060, a postal code in Marion County, Kentucky, instead of 23222, which is Richmond, Virginia.

59.    The average home price in Marion, Kentucky, is $111,000.00 to $147,000.00, and the average home price in Richmond, Virginia, hovers around the mid $300,000s.

60.    The appraisal report inconsistently stated that the property value for single-family homes in the Property's neighborhood was "stable." In reality, and as confirmed by the subsequent appraisal, property values were rising during that period.

61.     The report also contained internal inconsistencies. For instance, one section claimed there was peeling paint observed at the Property, while another section stated there was "no evidence of peeling paint."

62.    In determining market value, the appraiser relied on the Sales Comparison Approach but did so in a distorted way. The report claimed that only two comparable properties were available in the market area.

63.    The later appraisal by Premier Appraisal group identified at least four suitable comparables in the area.

64.    The Appraiser Defendants limited the search and then chose comparables with significantly lower values than Plaintiff's property should command.

65.    In effect, the appraiser appears to have cherry-picked and manipulated comparable homes to justify a predetermined low valuation.

9

66. Lastly, Plaintiff's property was, at the time, used as a rental property generating income. Plaintiff had a tenant residing in the property. The Appraiser Defendants were aware of this fact and indicated in the appraisal report that a tenant occupied the home.

67. The tenant on Plaintiff's property was a mixed-race couple, a white wife and a black husband.

68. The female tenant's mother and Ms. Braxton were present during the appraisal.

69. The Appraiser asked Plaintiff if she owned the home, and Plaintiff said yes.

70. The appraiser did not like the idea that a black woman owned the home being rented by a white tenant.

71. However, the appraisal report completely ignored the income potential of the Property. It did not include any rental income data or an "income approach" valuation, which is commonly used for investment or rental properties to gauge value based on rent.

72. By omitting this analysis, the appraiser failed to account for a significant value indicator.

73. Given the strong rental market in Richmond, the Property's proven ability to produce income would have supported a higher valuation. The omission of this data made the appraisal incomplete and misleading.

74. The undervaluation of Plaintiff's home by the Appraiser Defendants was influenced by conscious or unconscious racial bias.

75. Bank of America commissioned the appraisal by the Appraiser Defendants and fully relied on their appraisal report.

76. The low appraisal directly contributed to an adverse lending decision.

77. Bank of America's employees failed to recognize or correct the appraisal's obvious flaws.

**Loan Denial And Subsequent Events**

78.     Bank of America eventually denied Plaintiff's mortgage loan request in October 2026.

79.     Bank of America cited ostensibly specific reasons for the denial, but these reasons were minor, resolvable issues that do not credibly justify denying a well-secured loan to an otherwise qualified borrower.

80.     First Bank of America cited an issue with the Plaintiff's auto loan. Plaintiff had an auto loan or payment obligation under her business's name. BOA requested documentation or verification of this debt. Plaintiff provided her payment records and explained the nature of the loan. This issue was trivial and could easily have been cleared up with any follow-up, yet BOA listed it as a ground for denial.

81.     BOA also cited an issue regarding Plaintiff's Tax. BOA asked for evidence regarding Plaintiff's tax status, apparently to check if she was current on any tax obligations or on a payment plan for taxes. Plaintiff attempted to obtain IRS transcripts or an official letter to confirm she had no delinquent tax debts.

82.     Plaintiff could not get a formal IRS response before BOA's self-imposed deadline due to the government shutdown. Nonetheless, BOA treated the lack of an immediate IRS letter as a failure by Plaintiff.

83.     In truth, Plaintiff was a highly qualified applicant for the loan.

84.     Plaintiff was financially qualified for the $100,000.00 loan she sought.

85.     Plaintiff already owned the Property outright, which meant the loan would be fully secured by substantial equity.

86.     Plaintiff had a reliable income as she was gainfully employed, lived in a dual-income household,  and her credit history was sufficient for the loan amount.

11

87.    In addition to the above-stated sources of income, Plaintiff received income from the property, as it is a rental property, and she has a tenant in the property.

88.    In fact, immediately after Bank of America's denial, Plaintiff applied for a mortgage loan with Guild Mortgage Company, the lender that held the mortgage on her primary residence. Guild Mortgage approved Plaintiff for a $105,000.00 loan at 6.5% on the same Property, with minimal hassle. This approval came in a comparable time frame, indicating that Plaintiff met standard lending criteria.

89.    Upon information and belief, Bank of America's real motive in denying the loan was not the proffered paperwork issues, but intentional discrimination.

90.    The entire pattern of BOA's conduct, from the poor customer service to the reliance on a skewed appraisal and the hyper-focus on trivial issues, indicates that Plaintiff was being treated differently from others.

91.    The reasons given for denial were so insubstantial that no fair-minded lender would normally reject a loan solely on those grounds, especially given Plaintiff's equity.

92.    Throughout her interactions with Bank of America, Plaintiff was persistently met with obstacles that were not grounded in legitimate business justifications. The repeated failures to communicate, the transfer from one officer to another, the lost or re-requested paperwork, the refusal to provide a secure method to submit documents, the branch officer literally avoiding her in person, and the ultimately unfounded reasons for denial all point to disparate treatment.

93.    Plaintiff is informed and believes that she was treated in this manner because of her race. Had Plaintiff not been a Black woman, it is far less likely she would have been subjected to this "run-around" or had her property's value unfairly minimized.

12

94.     Indeed, Plaintiff is aware of similar applicants (non-black/African Americans) who have received more prompt and professional service from the same branch on their loan applications.

95.     On several occasions, when Plaintiff was physically present in the store, Plaintiff witnessed BOA employees help the white customers, but those same employees would walk away from her.

96.     Bank of America's conduct resulted in humiliation, stress, and delay for Plaintiff, and required her to seek out alternative financing on her own to achieve what she should have obtained through Defendant in the first place.

97.     Defendants David M. Boyd and Velox Valuation intentionally engaged in discriminatory practices in appraising the Plaintiffs' Home, including by arbitrarily limiting the area from which Defendant drew comparables, then selecting among the least valuable comparables from what remained, and, finally, further depressing the appraisal by making unjustifiable adjustments to value that further devalued the Plaintiff's home.

98.     Defendant Bank of America injured Plaintiff by relying on the Appraiser Defendants' discriminatory appraisal to deny Plaintiff's loan despite the fact that it knew or should have known that the appraisal was racially discriminatory. It was an obvious and egregious undervaluation of the Plaintiff's home.

99.     Defendant Bank of America Corporation and Bank of America National Association further injured Plaintiff by causing her significant emotional distress, including humiliation and embarrassment, arising from being subjected to discrimination.

100.    Defendants' actions were willful and/or taken in reckless disregard of the civil rights of Plaintiff.

101.    Defendants' actions caused Plaintiff significant humiliation and embarrassment.

13

## CAUSES OF ACTION

### COUNT I
### Violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq.
### (Against all Defendants)

102.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

103.    Plaintiff is a member of a protected class who applied for and qualified for an extension of credit (the loan).

104.    Plaintiff's application for a mortgage loan on her property was a residential real estate-related transaction as defined by the federal Fair Housing Act (FHA). Specifically, it involved "[t]he making or purchasing of loans…A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate." and the "appraising of residential real property." 42 U.S.C. § 3605.

105.    The Property in question is a "dwelling" within the meaning of 42 U.S.C. § 3602(b), as it is a house intended for occupancy as a residence.

106.    Defendants are all subject to the Fair Housing Act's prohibitions.

107.    Bank of America is a business engaged in residential real estate-related transactions (including making mortgage loans).

108.    Defendants Boyd and Velox Valuations are persons/entities engaged in the appraising of residential real property in connection with such transactions.

109.    Each Defendant is therefore bound by 42 U.S.C. § 3605 and related provisions of the FHA.

110.    The Fair Housing Act makes it unlawful for any such person or entity to discriminate against any person in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race, color, or sex.

111.    Defendants' conduct, as alleged herein, violates multiple provisions of the Fair Housing

14

Act. Specifically, Defendants have engaged in the following discriminatory housing practices:

    a) Discrimination in the terms, conditions, or privileges of a sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, or national origin, in violation of 42 U.S.C. § 3604(b);

    b) Making, printing, or publishing, or causing to be made, printed, or published a notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates a preference, limitation, or discrimination based on race, color, or national origin, or an intention to make such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c)

    c) Discrimination in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race, color, or national origin, in violation of 42 U.S.C. § 3605;

    d) Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 3604 of Title 42, in violation of 42 U.S.C. § 3617.

112. Bank of America rejected Plaintiff's application despite Plaintiff's qualifications and continued to extend credit to others of similar credit who are not black women.

113. Bank of America, through its employees and agents, violated the Fair Housing Act by making the loan unavailable to Plaintiff by denying her mortgage loan even though she was qualified; subjecting plaintiff to unfavorable terms and conditions in the application process in a manner that was not imposed on other applicants of different race and gender; procuring and relying on a biased and improper appraisal of Plaintiff's property; and overall interfering with Plaintiff's exercise of fair housing rights.

114.    But for Plaintiff's race and gender, Bank of America would not have denied the loan. The fact that another lender approved Plaintiff under the same conditions underscores that Defendant's denial was not truly about finance but was influenced by unlawful bias.

115.    Mr. David M. Boyd and Velox Valuations violated the FHA by intentionally or negligently undervaluing Plaintiff's home on the basis of race. In doing so, the Appraiser defendants denied Plaintiff an accurate and fair appraisal service because of race.

116.    The discriminatory actions of Defendants caused Plaintiff significant harm, including economic losses, emotional distress, and other consequential damages.

117.    Accordingly, Plaintiff is an "aggrieved person" as defined in 42 U.S.C. § 3602(i) and is entitled to relief under 42 U.S.C. § 3613(c).

WHEREFORE, and pursuant to 42 U.S.C. § 3613(c), Plaintiff respectfully requests Judgment in her favor against Defendants for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires.

**COUNT II**
**Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq.**
**(Against Bank of America)**

118.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

119.    Plaintiff is an "applicant" for credit, and Bank of America is a "creditor" as those terms are defined in the Equal Credit Opportunity Act (ECOA) and its implementing regulations.

120.    ECOA makes it unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, on the basis of race, color, or sex. 15 U.S.C. § 1691 (a)(1).

121.    Plaintiff is a member of a protected class on the basis of her race (African American/Black) and her sex (Female).

122.    Defendants violated ECOA by discriminating against Plaintiff on the basis of her race and sex in the handling and ultimate denial of her credit application. The discrimination occurred with respect to multiple aspects of the credit transaction, including but not limited to the lack of customer service and assistance provided; the requirements imposed on Plaintiff's application; the appraisal of Plaintiff's property; and the decision to deny the loan.

123.    Plaintiff qualified for the loan as she had sufficient income and good credit.

124.    Plaintiff was subjected to disparate treatment throughout the process. Defendant's employees failed to provide her the ordinary level of assistance and courtesy extended to other loan applicants of different races and sexes.

125.    Defendant's conduct, as alleged herein, constitutes discrimination with respect to aspects of a credit transaction on the basis of race, color, or national origin, in violation of 15 U.S.C. § 1691(a)(1).

126.    As a direct result of Defendant's actions, Plaintiff has suffered damages.

127.    Accordingly, Plaintiff is an aggrieved applicant who is entitled to relief under 15 U.S.C. § 1691e.

        **WHEREFORE**, Plaintiff respectfully requests Judgment in her favor against Defendant for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires.

### Count III
### Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981
### (Against All Defendants)

128.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

129.    42 U.S.C. § 1981 forbids racial discrimination in the making of contracts, including contracts for financial services or loans. The term "make and enforce contracts" in §1981 includes

17

the making, performance, and termination of contracts, and the enjoyment of all benefits and privileges of the contractual relationship, territory to make and enforce contracts…as is enjoyed by white citizens."

130. The loan application was part of Plaintiff's attempt to enter into a contractual relationship with Bank of America.

131. Defendants violated 42 U.S.C. § 1981 by intentionally interfering with Plaintiff's right to make and enforce a contract for a mortgage loan because of her race. Defendants treated Plaintiff in a manner that impeded the formation of a loan contract on equal terms as would be extended to white applicants. This included: Declining to contract with Plaintiff (denying the loan) for reasons that were not applied equally to similarly situated white customers; Imposing obstacles in the contract formation process (excessive requirements, lack of communication) that were motivated by racial bias and not applied to non-Black customers; and undervaluing Plaintiff's property in the appraisal because of Plaintiff's race.

132. Plaintiff was ready, willing, and able to contract on the loan agreement with Bank of America.

133. But for Defendants' intentional interference and discrimination, Plaintiff would have obtained the loan contract. The subsequent approval by another lender underscores that the contract was feasible and was denied only because Defendants introduced racial bias into the equation.

134. Defendants' conduct was purposeful or, at a minimum, in reckless disregard of Plaintiff's right to be free from racial discrimination in contracting.

135. As a direct result of Defendants' actions, Plaintiff suffered the damages described earlier, including lost contracting opportunity, financial losses, and emotional distress.

136. Accordingly, Plaintiffs are entitled to relief under 42 U.S.C. §§ 1981 and 1988(a).

**WHEREFORE**, and pursuant to 42 U.S.C. § 1981, Plaintiff seeks all remedies available under, including compensatory damages for the economic and emotional harm caused, as well as punitive damages to punish and deter Defendants' discriminatory conduct, plus attorney's fees and costs (pursuant to 42 U.S.C. § 1988).

**Count IV**
**Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982**
**(Against All Defendants)**

137. Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

138. 42 U.S.C. § 1982 prohibits racial discrimination in transactions involving real and personal property.

139. The mortgage loan Plaintiff sought is integrally tied to property rights: by obtaining the loan, Plaintiff aimed to "hold" and improve her real property (the investment home) using the loan funds, and the loan would be secured by a lien (an interest in real property). Denying a loan based on race thus implicates §1982 because it interferes with the right to acquire, use, and hold property on equal terms. Furthermore, requiring Plaintiff to change the title of her Property (from a business to her personal name) and then failing to extend credit to her on equal terms also affects her property rights in a discriminatory manner.

140. Defendants violated 42 U.S.C. § 1982 by denying Plaintiff the same rights as white citizens to use and enjoy property. By refusing to provide financing to Plaintiff for which she qualified on the basis of race, Defendants denied Plaintiff an equal opportunity to "purchase, hold, and convey" property.

19

141.    Defendants interfered with Plaintiff's ability to leverage her property in the same way that white property owners can and diminished the value of her property through a biased appraisal, thereby impeding her right to realize the full value of her property.

142.    Defendants' conduct was intentional or in reckless disregard of Plaintiff's protected rights under §1982. Racial bias was the motivating factor behind the obstacles Defendant erected in Plaintiff's property-related transaction.

143.    As a proximate result, Plaintiff suffered the harms previously described, including economic loss, diminished property value, and emotional harm.

144.    Accordingly, Plaintiffs are entitled to relief under 42 U.S.C. §§ 1982 and 1988(a).

WHEREFORE, and pursuant to 42 U.S.C. § 1982, Plaintiff seeks all appropriate relief under, including compensatory and punitive damages, as well as attorney's fees and costs (pursuant to 42 U.S.C. § 1988).

**Count V**
**Violation of the Virginia Fair Housing Laws, Va. Code § 36-96.1 et seq**
**Against all Defendants**

145.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

146.    The Virginia Fair Housing Law (VFHL), Va. Code § 36-96.3, parallels the Federal Fair Housing Act prohibits housing discrimination on the basis of race and sex, among other characteristics. It is unlawful in Virginia to discriminate in residential real estate-related transactions, including housing financing and appraisal, because of race. It is also unlawful to discriminate in the terms, conditions, or services in connection with housing because of race.

147.    Plaintiff's mortgage loan application and the appraisal of her home are "residential real

20

estate-related transactions" under Va. Code § 36-96.1:1 (including the making of loans for purchasing, constructing, improving, repairing, or maintaining a dwelling, and the appraising of residential real property).

148.    Defendants, as a lender and appraisers, are persons or entities covered by the VFHL. Va. Code § 36-96.4.

149.    The actions of all Defendants, as described above, constitute race-based housing discrimination in violation of Virginia Law.

150.    Bank of America discriminated by withholding and denying the loan to Plaintiff because of her race and sex. BOA also discriminated in the terms and conditions of the transaction, subjecting Plaintiff to delays and burdens not imposed on others. This violates Va. Code § 36-96.3.

151.    Furthermore, BOA's poor treatment of Plaintiff during the application can be seen as discrimination in the provision of services in connection with the sale or rental of a dwelling (her ability to maintain/improve her dwelling), in violation of Va. Code § 36-96.3.

152.    The Appraiser Defendants discriminated in the appraising of residential real property on the basis of race, in violation of Va. Code § 36-96.3.

153.    By delivering a biased, low appraisal because the homeowner is Black (or the home is in a predominantly Black area), these Defendants denied Plaintiff a fair and equal valuation and limited Plaintiff's ability to benefit from her dwelling, a result the VFHL squarely forbids.

154.    Plaintiff is an "aggrieved person" under the VFHL, meaning she has been injured by the discriminatory practices. The harm she suffered under Virginia law is coextensive with the harm described under the FHA count: financial loss, loss of housing-related opportunities, and emotional harm within the Commonwealth of Virginia.

21

155.    Defendants' actions made housing-related financial services unavailable to Plaintiff on equal terms and conditions and interfered with her ability to fully enjoy and leverage her residential property.

156.    As a direct and proximate result of Defendants' violations of the VFHL, Plaintiff suffered economic loss, emotional distress, and other damages.

157.    Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's rights under Virginia law.

158.    Under Va. Code § 36-96.18, if the Court finds that Defendants engaged in any unlawful discriminatory housing practice, the Court may award actual damages and punitive damages, as well as injunctive or other equitable relief, and attorneys' fees.

WHEREFORE, Plaintiff respectfully requests Judgment in her favor against Defendants for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires

## Count VI
### Negligence
### (Against Bank of America)

159.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

160.    The Defendant had a legal duty to the Plaintiffs.

161.    Upon accepting the loan application, Bank of America had a responsibility to the Plaintiff to comply with Federal and Virginia laws pertinent to policies and procedures governing real estate appraisals and the hiring and performance of appraisers.

162.    Defendant Bank of America has breached its fiduciary duties to the Plaintiffs in that it failed to comply with Virginia and federal law.

163.    Plaintiff has suffered damages as the direct result of the negligence of Defendant Bank of America.

WHEREFORE, Plaintiff respectfully requests Judgment in her favor against Defendant for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires.

### Count VII
### Negligence/Professional Negligence in Appraisal
### (Against David M Boyd and Velox Valuations)

164.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

165.    Under Virginia law, a professional real estate appraiser owes a duty to perform appraisal services with the ordinary care, skill, and diligence that a reasonably prudent appraiser would exercise, in accordance with applicable professional standards (such as the Uniform Standards of Professional Appraisal Practice, USPAP).

166.    Defendant David M. Boyd owed Plaintiff a duty under Virginia law to exercise reasonable care, skill, and diligence in performing the appraisal of Plaintiff's property.

167.    This duty included conducting the appraisal in accordance with accepted professional standards, including the Uniform Standards of Professional Appraisal Practice (USPAP), and without bias or improper considerations.

168.    Defendant breached that duty by negligently and unreasonably undervaluing Plaintiff's property, including by: Selecting inappropriate or inferior comparable properties; Failing to properly account for market conditions and property features; Allowing racial bias, whether explicit or implicit, to affect the valuation.

169.    As Boyd's appraisal management company or employer, Velox Valuations, LLC, is vicariously liable for Boyd's negligence because Boyd was acting within the scope of his engagement for Velox when he appraised Plaintiff's home.

170.    Additionally, to the extent Velox had any role in reviewing or approving the appraisal, or in selecting/assigning Boyd to the task, Velox independently owed a duty to ensure competent, unbiased appraisals through its network. Any negligence in supervision or process by Velox contributed to the breach of duty.

171.    The Appraiser knew or should have known that Bank of America would rely on the appraisal to make lending decisions and that Plaintiff would be foreseeably harmed by an inaccurate or biased valuation.

172.    As a direct and proximate result of the Appraiser's negligence, Plaintiff suffered damages, including denial of credit, loss of financial opportunity, and emotional distress.

**WHEREFORE**, Plaintiff respectfully requests Judgment in her favor against Defendants for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires.

## COUNT VIII
### Negligent Hiring and Retention
### (Against Bank of America and Velox Valuations, LLC)

173.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

174.    Virginia Courts have recognized the independent tort of negligent hiring. *Se. Apartments Mgmt., Inc. v. Jackman*, 257 Va. 256, 260, 513 S.E.2d 395, 397 (1999) "The cause of action is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others." *Id*.

175.    Virginia Courts have also recognized the independent tort of negligent retention. *Id.* *"As applicable to the facts of the present case, this cause of action is based on the principle that an employer owning leased premises is subject to liability for harm resulting from the employer's negligence in retaining a dangerous employee whom the employer knew or should have known was dangerous and likely to harm tenants." Id.* at 260-261.

176.    Bank of America owed Plaintiff a duty to exercise reasonable care in hiring and retaining agents and third parties, including appraisers, engaged to perform services integral to the mortgage lending process.

177.    Velox Valuations owed a duty to hire and retain only qualified and competent appraisers and to supervise their work in accordance with industry standards. Velox should not send out appraisers who are untrained or biased and should have quality control measures to catch egregious errors.

178.    Bank of America breached that duty by hiring and retaining an appraiser who lacked the competence or impartiality required to perform a fair appraisal; failing to adequately supervise, review, or audit the appraisal for material inaccuracies; and failing to offer a meaningful reconsideration of value despite obvious red flags.

179.    Bank of America employees did not audit or supervise the work of the appraiser.

180.    Bank of America knew or should have known that discriminatory or negligent appraisals pose a foreseeable risk of harm to borrowers, particularly borrowers from protected classes.

181.    Velox Valuations breached its duty by negligently engaging and overseeing Boyd.

182.    The negligent hiring/retention by BOA and Velox was a proximate cause of Plaintiff's injuries. It was entirely foreseeable that if an unfit or unmonitored appraiser was used, a bad appraisal could result and lead to a loan denial, harming the borrower. Both BOA and Velox are

25

in the business of housing finance and appraisals; they know the critical importance of a fair appraisal and the risks of a bad one. Their negligence in this regard directly led to Plaintiff receiving a biased valuation and being denied credit.

183.    The negligent hiring/retention by BOA and Velox was a proximate cause of Plaintiff's injuries. It was entirely foreseeable that if an unfit or unmonitored appraiser was used, a bad appraisal could result and lead to a loan denial, harming the borrower. Both BOA and Velox are in the business of housing finance and appraisals; they know the critical importance of a fair appraisal and the risks of a bad one. Their negligence in this regard directly led to Plaintiff receiving a biased valuation and being denied credit.

**WHEREFORE**, Plaintiff respectfully requests Judgment in her favor against Defendants for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires.

**Count IX**
**Breach of the Duty of Good Faith and Fair Dealing**
**(Against Bank of America)**

184.    Plaintiff repeats and realleges the preceding paragraphs, as if fully set forth herein.

185.    Under Virginia law, every contract and contractual relationship includes an implied covenant of good faith and fair dealing.

186.    Bank of America entered into a contractual or quasi-contractual relationship with Plaintiff by accepting her mortgage application, requiring documentation, ordering an appraisal, and undertaking to evaluate her eligibility for credit.

187.    Bank of America breached its duty of good faith and fair dealing by: Failing to process Plaintiff's application honestly and fairly; ignoring or disregarding evidence of an inaccurate and biased appraisal, and using pretextual reasons to deny Plaintiff's loan.

26

188.    Subjecting Plaintiff to unreasonable delays, non-responsiveness, and inconsistent treatment.

189.    Bank of America's conduct deprived Plaintiff of the benefit of a fair and non-discriminatory credit evaluation and frustrated her reasonable expectations.

190.    Plaintiff suffered damages as a result of this breach, including financial loss and emotional distress.

**WHEREFORE**, Plaintiff respectfully requests Judgment in her favor against Defendant for $250,000.00 in compensatory and punitive damages, plus costs, reasonable attorney's fees, and for such other relief that justice requires.

## **PRAYER FOR RELIEF**

WHEREFORE, all of the foregoing premises having been considered, Plaintiff seeks a judgment against Defendants, jointly and severally, for an amount that is more than $250,000.00 and for other damages to be determined by the fact finder, plus costs, fees, and attorney's fees, along with any other appropriate relief that this Court may determine is just and proper.

Respectfully Submitted,

/s/ Lucrecia P. Johnson
Lucrecia P. Johnson, Esq. VA Bar No. 96310
LPJ Legal, PLLC
853 New Jersey Ave SE, Suite 200
Washington, DC 20003
202-643-6211
lucrecia@lpjlegal.com
Attorney for Plaintiff

27